Our fifth case of the morning is appeal number 22-19-17. Michael Leisgang, is it? Yes. Leisgang versus the Commissioner of Social Security. Mr. Duncan, nice to see you. Good morning. Good morning. May it please the court. David Duncan on behalf of Michael Leisgang. I raised three issues in the limited time. First one is Dr. Donna, whose opinion. The second will be the vocational testimony. Dr. Donna, who had an opportunity to review the entire file, which is, you're well aware, involved from 2010 into 2018, Mr. Leisgang being inpatient for suicidal ideation and other mental health issues on a fairly regular basis, pretty much every other month, if not every three months. She indicated that he would have some difficulty in three issues, following a schedule, working without being distracted by others, and handling a normal work week. The ALJ did not apply those per se because she said that they were vague. Now I would point out that they were not so vague that the ALJ could not have applied the second one, which is being distracted by others. She provided a limitation to occasional interaction with the public, co-workers, and supervisors. So it's not so vague that she couldn't address that. The two that were, in her opinion, vague that she couldn't address were basically attendance issues. And my guess is, having listened to Mr. Gilkyson, the vocational expert, testify for 20 years, I could have about told you exactly what his testimony would have been on what is an acceptable level of unskilled absenteeism. But that was never addressed. Social Security puts rules and policies into place, like SSR 96-8P, which tells us exactly how ALJs are that the commissioner doesn't always apply them. It's kind of like trying to kick a 60-yard field goal when you're facing substantial evidence and the commissioner constantly is moving the goal post. In this particular case, she was supposed to provide an explanation. The only thing she said was vague, but as I planned out, wasn't so vague she couldn't have applied one of the three. And then she says, well, he had not treated. Well, I can point to pages 14 to 16 of my brief in support, outlining the facts of the case. He treated regularly between 2014 and 2018, including, I believe, the compensation pension examination that was done by the VA. So that's not accurate. And then the he's doing better now. The alleged onset date was 2010, with a date last insured of December of 2012. The fact that he's doing well now does not preclude her from at least making a partially favorable decision for the period where he is continually in and out of inpatient treatment. Well, with that in it, I guess, Mr. Duncan, are there limitations based on Dr. Duncan's testimony that you think the ALJ should have included but didn't? Yes, she should have addressed some aspect of either absenteeism or difficulty with scheduling. And what are your proposed limitations that she could have, should have included? Okay, those, something along that line. The ALJ has that duty to figure out what it means. The Commissioner continually argues that an ALJ has duty to interpret the medical evidence, and she could easily point to specific evidence if she wants to. I mean, I could point to and say he's going to be absent three or four days every other month. That's, the record would bear that out based upon all his inpatient treatment. But there's nothing in there indicating one way or the other. Mr. Duncan, Dr. Donohue, with regard to the scheduling difficulties, doesn't say that he's, Dr. Donohue says that Mr. Lesgang would have some difficulty following the schedule or handling a normal workweek without symptoms, right? Not that he can't, but just without symptoms. And the ALJ seems to go through the record and find that generally Mr. Lesgang's symptoms were controlled or were kind of abating or were controlled by the various medications and other therapies which he was being provided. So my question is, so given that condition, why would it, would the ALJ have been required to meet a difficulty that Mr. Lesgang would have had handling a normal workweek? Because she was responsible for assessing his condition and his disability from the date of 2010 to the date of the decision. And the improvement was only noted in 2019 and 2020. Mr. Duncan, can I, this is a very tedious question, but it gets, it gets to what you just raised, okay? Yeah. The ALJ number two seems to tell us that the relevant period here, I don't want to put words in their mouth, they can correct me, that the relevant period here is actually August 2018 forward. In other words, the the point you make about the onset date is, that's what's alleged here, but they say you really need to focus on whether he's disabled from August 18 forward because he's only able to get a period of 12 months before he applied. Correct. So what's the relevant period we should be focusing on? It's, that only applies to getting paid, okay? The onset date is still the relevant determination for deciding disability. That's the difference. It is two very fundamentally different questions. If you have a case where there really isn't any difference, I regularly in my hearings amend the onset date to correspond with the application date or the period where they can be paid. But in this case where we have such a long period of treatment and where the doctors in 2016 and 17 are telling him not to work, and that seems to be, at least from what I'm reading in the record, consistent with his improvement. When he stops working or trying to work, he gets better. Okay, so if we had a hypothetical case, not this one, but we have a case where we just stipulate that an applicant becomes disabled on January 1st of 2011. Yes. And all other dates, and everybody agrees, that's when, yes, the the dates that I would just kick in to limit the amount of disability insurance benefits that the applicant could receive or supplemental security income. That's correct. In fact, I've had one case years ago that I established disability in the 1980s, and we had to because that's the insured status. They only were able to get paid for the last four years of, by the hearing, but in order to get within assured status, and the insured status of this case is important because he's not eligible for SSI because he's now getting a VA pension, so he wouldn't qualify. So that's the significance. Turning down to the vocational testimony, I understand your decision in FedEx, and I guess what I want to point out two things, which is in reading BSTEC, which I've done now again for probably 30 times in preparation today, it states that you cannot waive substantial evidence, and if you put in an absolute requirement that the failure to object waives that, then you create a situation where anything the vocational expert testifies to can be accepted by the ALJ, and I put in the absurd thing about the vocational expert relying on a psychic to come up with his numbers. That's what we would be facing with, and the second point that I wanted to make is, is that in addition to the, it has to be an apparent, I guess instead of saying it's an absolute, because you're creating a categorical rule, it's addressed if you don't make it apparent enough, and in this particular case, we had a letter that was sent in saying we object to the foundation, and that I'd have to, and then we have Mr. Gilkyson testifying that he doesn't even believe his numbers accurately reflect. You ask him, and he says, this is all I've got. I mean, at that point in time, the ALJ should be doing something more than just sitting on our hands and accepting this blindly, and I'm not raising this because it's going to affect my practice, because we object, and we're doing post on everything, but these are informal hearings. About a third of these clients go to hearings unrepresented. We have non-attorney reps who have never had a case where they've had to apply a rule of evidence doing these hearings, and then we have people who dabble, and they do three, four, five cases a year. Did your letter that you indicated you submitted object to the methodology he was using? It doesn't use the term methodology, but it says we do not agree that the vocational expert may look at the right language. We do not stipulate our consent to the vocational expert providing numbers. We do not believe a proper foundation for his or her testimony will be established. We do not believe he has the training or experience sufficient to provide accurate job numbers or properly evaluate reductions in jobs secondary to non-exertional factors, limiting the occupant's occupational basis. That's on page 345. Now, interestingly, we had another case with Mr. Gilkyson saying the exact same thing, and that was a stipulated remand, and the remand order in that case indicates from the Appeals Council remand order when he says, I don't know, I don't have another method to use. The Appeals Council. Therefore, the vocational expert did not provide a reason and principle explanation for the methodology used. Moreover, the ALJ did not make any inquiries of the vocational expert regarding the reliability of the method he used in providing the cited numbers, and the record does not contain sufficient evidence to establish the reliability of the method used in producing the job numbers. So, on that... We'll give you a minute on rebuttal. Thank you. Let's hear from the Commissioner. May it please the Court, Megan Hughe on behalf of the Commissioner. I'd like to start with Dr. Donohue, since that's where opposing counsel started, and just, it is kind of technical and dry, but there is an additional nuance with respect to the dates and what the relevant period is here. Because of when he filed his application in August of 2019, he would have had to have been disabled within a There cannot be a closed period here based on the hospitalizations alone, because those hospitalizations ended in August of 2014, and the records show, as the ALJ explained, that he continued to treat at the Tomah VA Center and experienced significant improvements with medication and therapy, consistently documented throughout his mental status exams after 2014, that he had shown significant treatment gains, and that's in his own words as well. So, in terms of the period from 2010 to 2014, that would not support a closed period. He would have to show that he was continuously disabled through August of 2018, and that regulation is cited in that footnote that your Honor referenced, but it's 20 CFR 404.621. So it's really not simply a payment on a regulation about, like, payments, but he has to have actually proved continuing disability. Just briefly with respect to Dr. Donahue, the ALJ didn't say that it was so vague she couldn't figure out what Dr. Donahue meant. I don't, that's what counsel suggested. I mean, the ALJ didn't really have any obligation to address the some difficulty statements at all, because those were not Dr. Donahue's opinions about his residual functional capacity. His residual functional capacity is the most he can do, but critically, immediately after the areas in which Dr. difficulty, she said what he's capable of doing, and that was simple to complex tasks in a routine work setting on a regular basis. The ALJ adopted limitations consistent with that opinion and even went above and beyond what Dr. Donahue said. So any suggestion, I think, that the ALJ didn't account for the totality of the functional limitations that Dr. Donahue identified is incorrect. With respect to the vocation... It was only Dr. Yim, right? Definitely not Dr. Donahue. Dr. Yim in the pre-printed, whatever you call those things, questionnaires or, you know, the pre-printed questionnaire was the only one that opined that he could not work, right? Correct. She said he was incapable of low-stress work. Yeah. Does the panel have any questions about Dr. Yim? I got the sense that the vocation expert testimony may be more significant in this case. Thank you. You know, counsel referenced fetting, and I think fetting can dispose of this case. The claimant has to object at the hearing or he forfeits the objection, and the court said, quote, the objection must be specific. To avoid forfeiture, a claimant must do more than make a general objection or vaguely ask the VE about his methodology. It's clear under fetting, in earlier cases like Coyer and Liskowitz, that the testimony here, the questions asked, did not trigger an inquiry by the ALJ to ask further, and that he forfeits the objections he's now making in this court. Fetting also involved an issue where there was a pre-hearing letter, and that really cuts against the position here. I mean, counsel clearly is experiencing... Wasn't the pre-hearing letter different, though? Didn't the pre-hearing letter in fetting say something to the effect of, we reserve the right to do so, whereas the was more specific about the foundation? I believe there were two letters in this case. I don't recall the exact language. I thought it was the same, but I could be mistaken. I know there was one that reserved the right, and one that vaguely said, like, I don't believe that the vocational expert is going to be able to provide a rational methodology. But it wasn't specific to Mr. Gilkyson, certainly, and it shows, you know, that counsel knows what they need to do to preserve the objection. Similarly, at the beginning of Mr. Gilkyson's testimony, counsel said, again, I reserve the right to object to the sources and methods used. The ALJ said, certainly. Then we go on. He asks Mr. Gilkyson, what is the source of your job numbers? Okay, it's the occupational employment quarterly. How does that source estimate job numbers? It uses equal distribution method. But he didn't ask any questions about how the expert used the data from that publication to come up with the specific job numbers that he identified, didn't ask about the specific jobs, and Mr. Gilkyson provided jobs that are commonly found in the economy. There's really no credible way to argue that these jobs don't exist in significant numbers. If he didn't waive the objection, how is the VE's response when asked about the reliability of his methodology that it's the only method he had? How could that possibly be sufficient to establish reliability? I think that's not a good answer. I would prefer if he had given a more robust, you know, defense of the occupational employment quarterly, as I'm sure the court would have. But a couple points. That was not in response to a question about his own methodology. We don't know what he did to estimate the job numbers because he was not asked that question. He was asked about the occupational employment quarterly's method. So that's one thing to keep in mind. I think, you know, BSDEC emphasized that you have to look at the totality of the vocational expert's testimony, their qualifications, etc. What is the one answer that is not robust and should have been better? But on the other hand, we have his qualifications, the fact that he used a publication that this court has recognized vocational experts commonly use. Certainly the ALJ has had experience with experts relying on this publication. She's almost certainly had experience with this particular vocational expert. He identified how that publication gets its job numbers and he identified very common jobs existing in the economy, kitchen helper, sweeper cleaner, hospital cleaner. So I think certainly a reasonable mind could accept, even with one, you know, potential flaw in the testimony, all of that other indicia of reliability could lead a reasonable mind to accept his testimony as adequate to support the Step 5 finding and the ALJ reasonably did that. So are we getting any closer to having a new system? I looked, I did look at the most recent updates. The data collection for the second round is expected to be completed in 2023. They are working on the online portal that's going to house this system. It's going to be publicly accessible and the ALJs will use it as well. And then they're also working on the new regulations. Unfortunately, those documents do not say when it will be completed. But it is in progress. I appreciate it. That's the most update we've had several years. And I would just like to say one more thing about the Appeals Council remand order. In some other case, I don't know what that's referring to. These cases are decided on their own merits. That was not in the briefing. And I don't think that, you know, because we stipulated to a remand in one case involving this expert, that has nothing to do with the facts in front of the court today. If the panel has no further questions, I respectfully request that you affirm the District Court's decision. Okay, very well. Thank you. Mr. Duncan. I would point out that the one other doctor who did the compensation and pension examination for the VA found that he couldn't work. He had a substantial erosion of his ability. You remember that person's name? It doesn't matter. Yeah. They worked for the VA? Correct. And under the new regulations, obviously his conclusion that he's disabled can't be used. But his findings as to the specific evidence and what it showed can be. Okay. And then, and as far as not being able to interpret again, Section 1, and I pointed out in my reply, under Varga and the other cases, Section 1 is supposed to clarify if there's any dispute as to what the narrative meant. And that was been that there was moderate limitations in those areas. As far as the vocational testimony, the 11th Circuit in Good versus Commissioner, no objections was made. They specifically ruled in that case where the vocational expert testified and gave some huge number which encompassed the entire SOC code when there were 65 individual DOT codes with different exertional and skill levels. That was sufficient for them to overturn and send it back for rehearing or for a new hearing. So, on that, thank you. Okay. Thanks to you, Mr. Duncan. Ms. Hugo, thanks to you. We'll take the appeal under advisement. We'll move to our final.